**William DEGNAN, Jr., Plaintiff,**

v.

**PUBLICKER INDUSTRIES, INC., James Weis, Pension Plan of Fenwal Electronics, Inc., and Fenwal Electronics, Inc., Defendants.**

**Civil Action No. 94–12560–WAG.**

United States District Court, D. Massachusetts.

March 19, 1999.

Sydelle Pittas, Law Office of Sydelle Pittas, Winchester, MA, for Plaintiff.

Thomas E. Shirley, Raymond A. O'Brien, Choate, Hall & Stewart, Boston, MA, for defendants.

## MEMORANDUM OF DECISION

GARRITY, Senior District Judge.

In ruling upon the pending motion for summary judgment, the circuitous history of this protracted litigation is nearly as significant as the parties' shifting claims and defenses. The validity of the causes of action asserted by plaintiff is being weighed for the fourth time, the initial complaint having been dismissed by the district court, affirmed by the Court of Appeals in *Degnan v. Publicker Industries, Inc.*, 83 F.3d 27 (1st Cir.1996), which ordered supplemental briefs; and again on remand a second district court dismissal, but with leave to plaintiff to file a second amended complaint which, in this session of the court, has been the subject of com- prehensive briefing including reply and surreply memoranda and oral argument. What kind of a case is it? An ERISA case, originally dismissed on preemption grounds but revived by the intervening Supreme Court decision in *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), and remanded to the district court with pointed directions to the parties to develop further evidence on the question whether or not plaintiff is stating "*Varity*-type claims".

### I. *Factual Background*

Plaintiff's claims pertain to the pension plan of Fenwal Electronics, Inc. ("Fenwal Electronics"), a corporation originally separate from but owned by the same parent as Fenwal, Inc. Degnan started working for Fenwal, Inc. on June 15, 1959, at age 23. In 1962, both Fenwal companies became wholly owned subsidiaries of Walter Kidde & Company, Inc. ("Kidde, Inc."). On January 1, 1967, Degnan began contributing to the Fenwal, Inc. pension plan. Beginning in 1981 he served on the board of administration of Fenwal Electronics.[1] In March 1982, Degnan was transferred from Fenwal, Inc. to Fenwal Electronics as executive vice president and general manager and began contributing to the Fenwal Electronics pension plan on June 1, 1982. He became president of Fenwal Electronics in 1984.

Fenwal Electronics specialized in the manufacture of thermistors, which are electronic resistors made of a material whose resistance varies sharply in a known manner with the temperature. *See Webster's 3rd New Int'l Dictionary*, Cove, ed., 1967. On January 1, 1988, Kidde, Inc. sold both Fenwal, Inc. and Fenwal Electronics to another holding company, Hanson Industries, Inc. ("Hanson"), of New Jersey, which disposed of Fenwal, Inc., but not Fenwal Electronics, shortly thereafter. On December 19, 1990, Hanson sold a

---

1. Degnan continued to serve on the Fenwal Electronics board after Hanson's acquisition in 1988 and until the sale to Publicker in 1990; but the record is unclear whether he continued in that capacity after the acquisition by Publicker.

group of its subsidiary companies including Fenwal Electronics to defendant Publicker Industries, Inc. ("Publicker"), another holding company. Thenceforth, Degnan reported to and took orders from Publicker officers including the defendant James Weis, its vice president for finance and chief financial officer who was promoted to president in 1995, and Christopher Guntner, its vice president of corporate development and chief operating officer.

The Fenwal Electronics plan in which Degnan was a participant was a sort of hybrid plan by reason of an amendment made on December 12, 1990, seven days before the sale to Publicker. Sometimes called the transfer agreement, the amendment added a paragraph to § 1.12 of a plan adopted January 1, 1985, when Fenwal Electronics was a subsidiary of Kidde, Inc., by providing, with respect to Fenwal Electronics employees who transferred from Fenwal, Inc. to Fenwal Electronics before November 30, 1988, that their pension benefits from Fenwal Electronics would be offset by the amount of benefits payable to them pursuant to the Fenwal, Inc. plan. More significantly for present purposes (a) the amendment also stated that credited service "shall be deemed to include periods of employment with Fenwal, Inc."; (b) the unamended § 1.12 stated that credited service "shall mean the service as an Employee" and that credited service prior to the effective date of the amendment shall be determined by the provisions of the prior plan; and (c) § 1.12 of the prior plan adopted January 1, 1976, defined credited service to mean service as a participant. These provisions and their amendments raised questions in some quarters whether the Fenwal, Inc. employees who transferred to Fenwal Electronics before November 30, 1998—six in number including Degnan and his administrative

assistant Debra J. Camuti—were entitled on retirement to pension benefits calculated on the basis of years in which they made contributions to the plan or to years of employment whether or not contributing. Without overloading this memorandum of decision with references to the parties' briefs, exhibits and depositions, it is undisputed that during all the years of Degnan's employment the relevant ERISA plans provided that benefits would be calculated and payable only on the basis of years as to which a participant contributed.

Over the years Degnan made strategic choices regarding his participation in the relevant plans. He joined the Fenwal, Inc. plan in 1967 but stopped participating in May 1981, obtaining a $12,303 refund less than a year before his transfer to Fenwal Electronics. Three months after transferring from Fenwal, Inc. he began contributing to the Fenwal Electronics plan. Nine years later, on June 4, 1991, he withdrew contributions totaling $61,995—presumably his contributions to that date—plus interest, but continued making contributions until his retirement.[2] On deposition Degnan testified that the 1981 withdrawal occurred when he thought he might be leaving Fenwal, Inc. and the 1991 withdrawal when he was concerned about maintaining access to his contributions.

The events leading to this lawsuit began during the winter of 1991–92 when Degnan, then age 56, decided to retire. He told his superiors at Publicker that he would leave effective April 1, 1992. As of June 15, 1992, he would have been employed by the defendants, their predecessors or Fenwal, Inc. for a total of 33 years, and the years during which he contributed to the pension plan would total 24.5.[3] Defendants offered plaintiff an early retirement package with a consult-

---

**2.** Whether plaintiff's contributions after this withdrawal were contrary to the provisions of the plan, as defendant has contended, we think immaterial.

**3.** There is some dispute over the exact number of years of credited service to which plaintiff was entitled at his retirement; the issue is not relevant to this phase of the litigation. For simplicity, we use 24.5 years in this opinion.

ing agreement. The final resolution of their discussions included (a) an amendment to the pension plan of Fenwal Electronics dated May 1, 1992, (b) a post-retirement consulting agreement dated May 13, 1992, and (c) Degnan's retirement on June 30, 1992. The plan amendment is the centerpiece of this litigation. While the amendment does not name the plaintiff, and evidently applied to one or two other employees, its timing and other circumstances leave no doubt that it was designed for Degnan's prospective retirement. It is also clear that with respect to Degnan, the amendment was internally inconsistent, in purporting to grant him early retirement without the reduction specified in plan § 4.02, but conditioning this grant on his having contributed for more years (33) than he had to his credit (24.5). Indeed, it remains a puzzlement. How could defendants have innocently computed unreduced pension payments based on only 24.5 years of credited service, and conditioned the same early retirement on plaintiff's having accumulated at least 33 such years? On the other hand, how could plaintiff have innocently accepted early retirement conditioned on his having made substantially greater contributions to the plan than in fact he had? The essence of defendants' explanation is that they were confused; and of plaintiff's, that he took defendants at their word, and defendants never showed him the text of the amendment until after they denied him the contested benefits.

Plaintiff claims that the amendment's conditioning of unreduced early retirement benefits upon more years of credited service than he had accumulated was the keystone of a Publicker scheme to defraud him. Plaintiff contends that the defendants knew, actually or constructively, or, but for gross negligence, should have known, that he was ineligible for early retirement with unreduced benefits because of one of the conditions stated, and that defendants drafted the amendment with malice aforethought.

Plaintiff further submits that this scheme was advanced and implemented by implicit representations that he was qualified for early retirement without reduction: first by a hand-written note dated May 11, 1992, of which a copy was given to him three days later, stating that his monthly benefit under the revised pension plan provision would be $4,971; and later by a Publicker memo to him dated June 10, 1992, requesting that he return to the pension plan the sum of $61,995 withdrawn on June 4, 1991, plus interest of $6,067 and again promising unreduced early retirement benefits, this time at $4,504.06 per month, reflecting plaintiff's election of a 50% joint and survivor annuity. On June 15, 1992, plaintiff complied with defendant's request and paid back to the Plan the amount he had previously withdrawn plus interest, a total of $68,063.

For eighteen months after plaintiff retired, defendants made monthly payments of $4,504.06, reflecting 24.5 years of credited service, unreduced because of early retirement, i.e., retirement prior to age 65. During this period plaintiff abandoned any plans he had to work in the thermistor industry after the conclusion of his consulting agreement, sold his home, and retired to Cape Cod where he took up fishing for tuna. Subsequently, defendants notified Degnan that such payments were contrary to the provisions of the plan and reduced them to $2,058, thereafter further reduced to monthly payments of $1,655.34.[4]

Defendants respond that they drafted the May 1, 1992, amendment in good faith in the reasonable belief that plaintiff had completed at least 33 years of credited service and that, upon learning the details of Degnan's employment with predecessor

---

4. By this reduction of approximately $403 per month ($2,058 due under the plan and $1,655 paid) defendants sought to set off and gradually recapture their purported overpayments to plaintiff for each of 18 months in the amount of approximately $2,466 ($4,504 paid minus $2,058 due under the Plan).

companies and the limited extent of his contributions, they had no alternative to complying with the plan and denying him the early retirement benefits they had previously promised. They point to correspondence with Hanson, after the May 1 amendment, susceptible to the interpretation that the six employees who transferred from Fenwal, Inc. to Fenwal Electronics were awarded additional benefits on account of their past service, in particular a letter from Joseph D'Amato, Publicker's director of taxes and employee benefits, to Hanson dated July 17, 1992. The correspondence between Publicker and Hanson was concerned principally with the amount owed by Hanson to Publicker to fund the Fenwal Electronics plans' projected benefit obligation ("PBO") to Fenwal employees, as provided in the stock and asset purchase agreement between the companies dated October 26, 1990, whereby Hanson "agreed to make an additional contribution to the Pension Plan of Fenwal Electronics, Inc. (the 'Fenwal Plan') to fund benefit improvements to certain Fenwal employees prior to the closing." As late as June 17, 1993, in a letter to Hanson, D'Amato asserted that Hanson's PBO payment should be increased to cover service by Degnan during all periods of his employment with Fenwal, Inc., citing the language of the December 12, 1990, transfer agreement. On July 29, 1993, Hanson furnished D'Amato with a comprehensive statement of the basis for denying Degnan benefits covering periods of employment as to which he was either not eligible to participate in a plan or made no contributions. Publicker evidently conceded that Hanson was correct in its interpretation and agreed to accept a lesser payment in satisfaction of Hanson's PBO.

## II. Discussion

In remanding the case to the district court, the court of appeals saw both procedural and substantive problems. Orders of the district court before the case was transferred to this session addressed and resolved the former. Solution of the latter requires at the outset an understanding of the term "*Varity*-type claims" in the opinion of the appellate court, *Degnan* at 30. In our view, such claims clearly do not require allegations and proof of conduct as egregious as that of the defendant Varity Corporation. *Degnan*'s reliance on *Fitzgerald v. Codex Corp.*, 882 F.2d 586 (1st Cir.1989), and on the goal of avoiding injustice, supports an expansive reading of the term. So does the opinion's use of the singular noun in its statement, "The substantive problem is whether or not the plaintiff can state *a claim* under *Varity*," *id.* at 30 (emphasis added), and the mandate's use of the plural "*claim(s)* under ERISA" (emphasis added). Additionally, the *Varity* decision itself, especially its embracing the "common-law duty of loyalty" and citation of the Restatement (Second) of Trusts, 516 U.S. at 506, 116 S.Ct. 1065, and its discussion of "ERISA's basic purposes", *id.* at 513, 116 S.Ct. 1065, accord with a liberal construction of the term "*Varity*-type claims".

On the other hand, not every claim by an individual plan participant or beneficiary "fits the *Varity* mold". *Degnan* at 31. Factual differences must be and have been weighed. For example, the employees of Varity Corporation were choosing whether to change employers and benefit plans. Plaintiff here was negotiating the terms of his resignation and an agreement not to compete. He was in the process of forsaking continued participation in the Fenwal Electronics plan, except as a beneficiary. From the *Degnan*, *Varity* and other decisions and learned journal commentaries, *e.g.*, Dana M. Muir, *Truth or Consequences: Varity v. Howe and Beyond*, 13 Lab. Law. 411 (1998), Frank P. Vanderploeg, *Role–Playing under ERISA: The Company as "Employer" and "Fiduciary"*, 9 DePaul Bus. L.J. 259 (1997), it is apparent that a claim is a *Varity*-type claim when it claims appropriate equitable relief for a violation of a fiduciary duty by an ERISA plan fiduciary. Procedurally plaintiff has asserted such a claim. Has

he proved it sufficiently to withstand defendant's pending motion for summary judgment?

The controlling standard is well settled. A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Terry v. Bayer Corp.*, 145 F.3d 28, 34 (1st Cir.1998). Throughout our consideration of defendants' pending motion, we must review the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *See Hinchey v. NYNEX Corp.*, 144 F.3d 134, 140 (1st Cir.1998). The non-moving party plaintiff can thwart summary judgment simply by showing a genuine issue of material fact, i.e., a material issue that a rational factfinder could resolve in his favor. *See Allstate Ins. Co. v. Occidental Int'l, Inc.*, 140 F.3d 1, 2 (1st Cir.1998).

■ First, we distinguish defendants' nonfiduciary activities. The focus of plaintiff's claims from their inception has been defendant's breach of its promise to provide him with unreduced early retirement benefits. Plaintiff's claim of fraud, viz., that defendants never intended to keep their promise and misled him in order to obtain a post-retirement agreement with a non-compete clause, superseded his breach of contract claims. That these claims were dismissed on preemption grounds has not diminished plaintiff's reliance on them; and they do remain somewhat relevant. Plaintiff's problem here is that ERISA's definition of fiduciary at § 3(21)(A), codified at 29 U.S.C. § 1002(21)(A), does not include the establishment and amendment of benefit plans. As stated in *Lockheed Corp. v. Spink*, 517 U.S. 882, 891, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996), "... the act of amending a pension plan does not trigger ERISA's fiduciary provisions." *See also Johnson v. Georgia–Pacific Corporation*, 19 F.3d 1184, 1188 (7th Cir.1994). It follows that in adopting the May 1, 1992, amendment Publicker was acting as an employer or settlor and not as a fiduciary; and that if plaintiff is to prove a *Varity*-type claim, it must be predicated upon Publicker's conduct apart from its allegedly fraudulent amendment of the plan.[5]

■ Thus the proper focus of plaintiff's cause of action for breach of fiduciary duty has become defendants' conceded overstatement to plaintiff of his monthly benefits under the plan, their failure to correct their misstatements more promptly, and, perhaps, their failure to keep him informed about their negotiations with Hanson regarding the size of Hanson's PBO payment, despite the fact that these negotiations affected Degnan's entitlement directly, and probably affected no one else's. *See Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1302–1303 (3d Cir.1993) (ERISA fiduciary had duty to convey complete and accurate information material regarding beneficiary's circumstances even if circumstances were broader than beneficiary's inquiry); *see also Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 750 (D.C.Cir.1990) ("the duties of an ERISA fiduciary are not limited by that statute's express provisions but instead include duties derived from common law trust principles.").

■ *Varity* analyzed two essential elements of a claim under ERISA § 502(a)(3): first, that the defendant must be acting as a fiduciary of the plan when it engaged in the conduct complained of. This issue turns on whether the defendant was exercising "discretionary authority" respecting "management" or "administration" of an ERISA plan and is easily resolved affirmatively in the case at bar. Indeed, in *Vari-*

---

**5.** As late as June 11, 1998 when he filed a surreply brief, plaintiff reasserted the fraud claims dismissed on September 12, 1995.

*ty,* the dissent conceded that "a plan administrator engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents," *id.* at 511, 116 S.Ct. 1065, which describes precisely what Publicker was doing when writing to plaintiff on May 14 and June 10, 1992.

■ The second essential element in a § 502(a)(3) claim is that the defendants' conduct amounted to a breach of fiduciary duty under ERISA, whose so-called exclusive benefit rule commands the fiduciary to act "... for the exclusive purpose of ... providing benefits to participants and their beneficiaries ...." ERISA § 404(a)(1)(A). This broad obligation, informed by the common law of trusts, "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *Bixler,* 12 F.3d at 1300 (citing Restatement (Second) Trusts § 173, Comment d). Plaintiff claims that defendants violated both negative and affirmative duties and did so either in bad faith or with gross negligence. Regarding defendants' negative duty, it is undisputed that they misinformed plaintiff, in a hand-written memo given to plaintiff on May 14, 1992, and in an interoffice memorandum dated June 10, 1992, by overstating substantially the amount of his monthly benefits under the plan.

Degnan charges the defendants with persistent bad faith, arguing that he informed defendants, in January 1992, that he planned to retire in April, and that in March they offered him an early retirement package with a consulting agreement he did not solicit and whose main purpose was to bar him from the industry. Plaintiff contends that the defendants formed a plan in January or February 1992 to trick him into signing the non-competition agreement on June 24, 1992, and to use, eighteen months later, the May 1, 1992 amendment as a "time bomb" to destroy his promised expectations, in conjunction with an intent to terminate the Fenwal Electronics pension plan, buy lower-than-anticipated annuities and keep for themselves any funds that were left over. If defendants did attempt to trick plaintiff, an action for breach of fiduciary duty would lie. *See Varity.* But plaintiff's evidence of such an overall plan is wholly circumstantial and speculative, insufficient in our view to raise a genuine issue of material fact.

On the other hand, defendants' state of mind on May 14 and June 10, 1992, when misinforming plaintiff, is clearly material. *See Varity,* 516 U.S. at 506, 116 S.Ct. 1065; *see also International Ass'n of Machinists & Aerospace Workers v. Masonite Corp.,* 122 F.3d 228, 234 n. 5 (5th Cir.1997) (dismissing *Varity*-type claim absent showing of intent to deceive). Plaintiff did discover evidence that may show that defendants' misrepresentations of plaintiff's entitlement under the amended plan were knowing. In particular, an actuarial assistant, Pastino, who was requested by Publicker in May 1992 to calculate Degnan's benefits at age 65, saw a shortfall in his credited service according to card records maintained by Fenwal Electric, viz., a total of less than the 33 years required by the plan amendment, and brought this to the attention of D'Amato, plan administrator. Pastino testified on deposition that D'Amato told him to go ahead with calculations based upon 33 years of credited service. Defendants reject any adverse inference from this testimony on the basis of correspondence with Hanson evidencing its confusion and belief that Degnan had the critical 33 years of credited service, and the folly of intentionally overpaying a retiree. Nevertheless, a genuine issue of material fact remains.

The Supreme Court in *Varity* reserved decision on the question whether a negligent failure to disclose information can constitute a breach of fiduciary duty under ERISA. *See id.* at 506, 116 S.Ct. 1065 ("we need not reach the question whether ERISA fiduciaries have any fiduciary duty

to disclose truthful information on their own initiative, or in response to employee inquiries."). While the First Circuit, in a pre-*Varity* case, declined to reach the question whether or not federal common law of negligent misrepresentation should be established, it did so in the context of allowing an ERISA claim against an employer-fiduciary for failing to disclose information that would have influenced the employee-plaintiff's decision to take early retirement. *See Vartanian v. Monsanto*, 14 F.3d 697 (1st Cir.1994). Other courts of appeals have found that negligence by the plan administrator, resulting in a failure to disclose information needed by the beneficiary, can breach ERISA's fiduciary duty and subject the administrator to liability. *See, e.g., Jordan v. Federal Express Corp.*, 116 F.3d 1005 (3d Cir.1997). Moreover, the consistent view that ERISA preempts common-law negligence claims implies that the statute also imports negligence concepts from the common law.

These and similar holdings are supported by *Varity*'s explicit references to, and drawings from, the common law of trusts, *see, e.g., id.* at 506, 116 S.Ct. 1065, and the "Duty to Furnish Information" included in the Restatement (Second) of Trusts § 173 and comment d. Indeed, "trustees have been surcharged where they have not personally profited from their breach, in situations where they have either negligently or knowingly permitted third parties to benefit from the trust property." *Morrissey v. Curran*, 650 F.2d 1267, 1282 (2d Cir.1981) (citing *In re Johnson*, 518 F.2d 246 (10th Cir.1975)). In this case, plaintiff alleges that defendants themselves improperly benefitted from their actions, by inducing Degnan to forego other opportunities in the thermistor industry through promises of increased retirement benefits, and by then refusing to pay him the promised benefits and even recouping the costs, through payment deductions, of the first eighteen months of higher benefits paid. The issues here presented are whether the retirement agreement was wholly distinct from the consulting agreement, and whether the latter constituted the sole consideration for plaintiff's agreement not to compete.

■ The standard applicable to defendants' conduct is elaborated by ERISA's command that fiduciaries discharge their duties with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." ERISA § 404(a)(1)(B); *see also Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 18 (1st Cir.1998). In our opinion, negligence can, at least under some circumstances, rise to the level of breach of fiduciary duty under *Varity*. Under this test, plaintiff has presented other genuine issues of material fact. In particular, did the defendants breach their fiduciary duty to plaintiff, *inter alia*, in the following respects:

(1) by designating D'Amato as plan administrator?

(2) by failing to supervise D'Amato more closely?

(3) regarding Weis in particular, by his failing to read, or otherwise become familiar with the details of, the plan?

(4) by misconstruing the so-called transfer agreement, dated Dec. 12, 1990?

(5) by representing to plaintiff that his monthly payment would be $4,504, despite the plan terms calling for $2,068?

(6) by failing to disclose to plaintiff, for more than a year, the contents of Hanson's letter dated Oct. 15, 1992?

Defendant's final arguments bypass the central question, whether or not plaintiff has stated a *Varity*-type claim, and go directly to contingent issues of remedy. They are akin to points urged by defendants in support of motions to dismiss previously considered by other judges and denied; and relate to the availability to plaintiff, should he prevail on issues of liability, of "appropriate equitable relief" under ERISA § 502(a)(3) and *Varity*.

122

While our consideration of this question is obviously contingent and subject to modification in light of the evidence at trial, we have not overlooked it.

■ As defendants correctly note, ERISA precludes relief at law, through money damages. Defendants submit that plaintiff's claim cannot be equitable in nature because, if he prevails in full, his relief will be measured by the difference between the benefits he was promised and the payments he received. Thus, defendants contend, plaintiff seeks money damages precluded by ERISA. Defendants support this claim with pre-*Varity* cases. *E.g., Slice v. Sons of Norway,* 34 F.3d 630 (8th Cir.1994). But reliance on such cases is inapposite, the Supreme Court having confronted, and rejected, essentially the same argument in *Varity* itself. *See id.* at 509–513, 116 S.Ct. 1065.

Defendants also challenge possible injunctive relief for an assumed successful plaintiff, viz., membership under revised terms in an existing plan. In *Varity,* plaintiff employees sought to be reinstated in a plan which they had left voluntarily, albeit because of fraudulent statements by an ERISA fiduciary. *See id.* at 492, 116 S.Ct. 1065. Defendants distinguish *Varity* from this case on the ground that it allowed plaintiffs to seek reinstatement into an existing plan, while plaintiff here seeks to amend the plan to which he already belongs. In this regard, however, *Varity* is quite similar to the case at bar. Reinstatement of members who would not otherwise qualify for a plan—the remedy in *Varity*—appears to be the practical equivalent of an order requiring amendment of the terms of the plan itself.

### III. *Conclusion*

For the reasons hereinbefore stated, the defendants' motion for summary judgment was denied by order entered January 29, 1999, which included a procedural order regarding preparation for trial.