**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

————

No. 18-10122

————

United States Court of Appeals
Fifth Circuit

**FILED**
January 9, 2019

Lyle W. Cayce
Clerk

SOUTHWEST AIRLINES COMPANY,

      Plaintiff - Appellant

v.

LOCAL 555, TRANSPORT WORKERS UNION OF AMERICA AFL-CIO,

      Defendant - Appellee

————

Appeal from the United States District Court
for the Northern District of Texas

————

Before WIENER, SOUTHWICK, and COSTA, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant Southwest Airlines Company ("Southwest") and Defendant-Appellee Local 555, TWU AFL-CIO ("Local 555"), the union representative for Southwest's ramp, operations, provisioning, and freight agents, agreed to a new collective bargaining agreement ("CBA"). The new CBA was ratified by Local 555's membership on February 19, 2016 and signed by the parties on March 16, 2016. The CBA contains provisions (1) stating that it would become "effective" after Southwest accepted the agreement and the union ratified it and (2) requiring that grievances be filed within ten working days of notice of a management decision. On March 28, 2016—within ten working days after the CBA was signed but more than ten working days after it was ratified—Local 555 filed a grievance against Southwest for using non-

union vendors to clean the interiors of "remaining overnight" ("RON") aircraft. In arbitration, Southwest challenged the grievance as untimely because it was filed more than ten working days after the CBA was ratified. The arbitrator ruled that the grievance was timely because Local 555 filed it within ten working days after the CBA was signed.

Southwest sought judicial review of the arbitration award, arguing that the arbitrator exceeded his jurisdiction by ignoring the CBA's terms. The district court declined to vacate the arbitrator's ruling, primarily based on the narrow scope of judicial review of labor-arbitration awards. Southwest appealed.

Despite the significant deference that we must pay to arbitrators, this case is an example of when an arbitrator goes too far. The terms of the CBA expressly state that it would become effective upon ratification. The CBA does not mention "signing" or "execution," and does not have any language linking its effective date to the signing date. Despite this, the arbitrator ruled that the CBA became effective on the date it was signed. In so doing, the arbitrator ignored the unambiguous terms of the CBA. We therefore reverse and remand.

## I. FACTS AND PROCEEDINGS

Southwest is a Texas corporation and a "common carrier by air" under the Railway Labor Act ("RLA"), 45 U.S.C. § 181. Local 555 is an unincorporated labor organization and the exclusive collective bargaining representative for the approximately 13,000 ramp, operations, provisioning, and freight agents Southwest employs. Southwest and Local 555 are parties to a CBA that governs rates of pay, work rules, and working conditions.

Local 555 disputed Southwest's use of non-union, third-party contractors instead of Southwest's unionized employees to clean the interiors of RON aircraft, i.e., planes that spend the night parked at airports. Southwest has contracted with third parties to perform this work since 1982. Local 555

contended that the practice violated a CBA provision about the use of third-party contractors.

## A.    The Collective Bargaining Agreement

Southwest and Local 555 have agreed to several CBAs over the years, but the timing of the most recent one is at issue here. After Southwest and Local 555 negotiated terms for a new CBA, Local 555 sent a "tentative agreement" to its membership, along with a document titled "Tentative Agreement Frequently Asked Questions and Answers." On February 19, 2016, Local 555's membership voted to ratify the new CBA. On March 16, 2016, Southwest's and Local 555's representatives signed and executed the CBA.

The cover page of the CBA states: "FOR THE PERIOD FEBRUARY 19, 2016 THRU FEBRUARY 18, 2021." The CBA also contains several terms that reference the date of *ratification*:

### ARTICLE THREE
### STATUS OF AGREEMENT

A.    **Ratification**. It is expressly understood and agreed that, when this Agreement is accepted by the Company and ratified by the membership of the Union, it shall be binding on both the Company and the Union and shall supersede any and all agreements existing or previously executed between the Company and the Union and/or any other organization representing the Employees hereunder.

. . .

### ARTICLE TWENTY EIGHT
### WAGE RULES

. . .

3.    **One-Time Bonuses:**

The Company will provide a one-time lump sum bonus for those Employees who have completed initial probation and are working under the TWU Local 555 Agreement as of the Date of Ratification

No. 18-10122

(February 19, 2016) and must be employed at Southwest Airlines five (5) business days prior to date of payment.

. . .

### ARTICLE TWENTY NINE
### DURATION AND AMENDMENTS

The entire Agreement shall remain in full force and effect as of the date of ratification through and including February 18, 2021, and thereafter shall be subject to change as provided in Section Six of the Railway Labor Act, as amended.

The CBA also set a ten-working-day deadline for grievances:

1. **Step 1/Department/Assistant Manager ("Manager").** If an employee is unable to resolve his grievance through his supervisor, within ten (10) calendar days of the occurrence of the circumstances in question, the grievance shall be summarized in writing and presented to the manager or his designee. . . . The manager or his designee shall issue a written decision upholding or denying the grievance within five (5) working days.

. . .

3. **Step 3/Labor Relations or designee.** If the decision of the Station/Provisioning Manager is unsatisfactory, the District Representative/designees of the Union may appeal the grievance to Labor Relations or designee, provided that such appeal is presented, in writing, within ten (10) working days after receipt of the Station Manager's decision. . . .

The CBA defines a "working day" as "Monday through Friday, excluding all Company recognized holidays."

The CBA's language does not specifically address the type of large-scale grievance at issue here, but instead pertains more to employees filing grievances based on unfair discipline. The parties agree, however, that the deadline for filing this grievance was ten working days after notice of the

4

management decision. The deposition testimony of Local 555's president confirms that the ten working-day deadline governs.[1] Based on this deadline, there is a reasonable argument that the instant grievance was filed more than thirty years too late because Local 555 had known about the complained-of practice since 1982. The arbitrator, however, rejected that argument based on the new CBA's so-called "zipper clause,"[2] which the arbitrator concluded nullified "all past practices and prior agreements between Southwest and Local 555." On appeal, Southwest did not challenge that determination. Based on that interpretation of the zipper clause, we proceed under the premise that Local 555's notice period began when the new CBA became effective.

Southwest began to implement the terms of the CBA after Local 555's members ratified it on February 19, 2016, including by paying the employees increased wages starting on March 1, 2016 and by using the ratification date to trigger employee bonuses. The parties signed the CBA on March 16, 2016.

## B.    The Arbitration Proceedings

After filing a number of grievances over several years about Southwest's use of third-party contractors, Local 555 filed the grievance at issue here, Grievance No. 5001/16, on March 28, 2016—within ten working days of when

---

[1] Local 555's president testified:

Q.      What is that time frame?

A.      Time frames is [sic] the amount of time that we have to file a grievance and how long you have to -- the other party has to respond.

Q.      And what is the that for the Union filing a grievance alleging the Company has violated a contract?

A.      Ten working days.

Q.      From what point?

A.      From when we became knowledgeable of the incident.

[2] That clause stated: "It is expressly understood and agreed that, when this Agreement is accepted by the Company and ratified by the membership of the Union, it shall be binding on both the Company and the Union and shall supersede any and all agreements existing or previously executed between the Company and the Union and/or any other organization representing the Employees hereunder."

the CBA was signed on March 16, 2016, but more than ten working days after it was ratified on February 19, 2016.[3]

In August 2016, while the instant grievance was pending in arbitration, a different arbitrator issued a decision on Grievance No. 5001/15 (a different grievance about the same issue), holding that the grievance was untimely because Local 555 did not file it within ten working days of the management decision to use non-union vendors.

In the instant arbitration, Southwest moved to dismiss the grievance on the grounds that it was (1) untimely and (2) barred by res judicata based on the other arbitrator's decision. In October 2016, the arbitrator held a hearing at which counsel for the parties presented witnesses and oral argument then filed post-arbitration briefs. In December 2016, the arbitrator issued a 38-page revised award setting out the parties' arguments and concluding that the instant grievance was (1) not barred by res judicata and (2) filed timely based on the signing date of the new CBA. The arbitrator's reasoning on the timeliness issue was as follows:

> The Union requested that the job duties involved in RONA aircraft cleaning be returned to the Union. When the Company failed to do so, the Union filed Grievance 5001/16. Based on the contractual time frames of the newly implemented CBA, the Union has ten working days to file a grievance. An important question is what is the date when the current CBA became effective and enforceable? The Company's position is that the CBA Ratification date of

---

[3] The district court thoroughly set out the procedural history of the arbitrations, much of which is not directly relevant to this appeal. In short, the grievance at issue here is the fifth about Southwest's use of third-party contractors to clean RON aircraft. Local 555 had filed two grievances about the issue in 2012, and another in 2015, but withdrew those grievances before the arbitrators reached their decisions. Local 555 filed a fourth grievance in November 2015, and while that grievance was pending and after the parties renegotiated their CBA, filed the grievance at issue here on March 28, 2016. In all the arbitrations, Southwest defended by insisting that the grievances were untimely based on Local 555's knowledge of Southwest's longstanding practice of using third-party contractors for RON cleaning.

No. 18-10122

February 19, 2016 is such a date. However the Union contends that the current CBA became effective and enforceable on March 16, 2016, the date which is shown on the Execution page of the current CBA. By way of explanation, the ratification of a CBA is an internal procedure in which the Union membership reviews the negotiated items within the CBA. Once such ratification is completed, the Company is so advised and the Parties then agree that both Parties (the Company and the Union) will approve the agreement. The agreement is signed and dated by officials of both Parties. That signing date becomes the Execution Date and is presented on the Execution Page of the agreement. The Execution Date for the newly negotiated CBA is March 16, 2016 which is listed on page 89 of the present CBA. Grievance 5001/16 was submitted to the Company on March 28, 2016. That March 16, 2016 date is within the ten day required filing date for grievances. In summary, this Arbitrator is convinced that Grievance 5001/16 was filed on a timely basis.

## C.    The District Court Proceedings

Southwest challenged the arbitration award in federal court under 45 U.S.C. § 153 First (q). Southwest and Local 555 cross-moved for summary judgment, with Southwest arguing that the award should be vacated for three reasons. First, the arbitrator prematurely reached the merits of the grievance. Second, the arbitrator's conclusion that the CBA took effect on the signing date rather than the ratification date ignored the express terms of the CBA and exceeded the scope of the arbitrator's jurisdiction. Third, the arbitrator's hostility toward Southwest amounted to "fraud or bias" sufficient to vacate the award under the RLA.

The district court affirmed in part and vacated in part. Local 555 did not dispute that the arbitrator prematurely addressed the merits of the grievance, so the court vacated "any and all portions of Arbitrator Jennings's award that venture beyond the threshold questions the parties presented." On the timeliness issue, the district court concluded that the arbitrator's decision did not exceed the scope of his jurisdiction:

7

No. 18-10122

Rather than endeavoring to interpret the parties' CBA for itself, the court is mindful of the narrow scope of its review. So long as the arbitrator's decision draws its essence from the contract in question, and does not ignore outright the CBA's plain language in a manner that reflects a personal brand of industrial justice, the court must defer to the arbitrator. See *Continental Airlines*[*, Inc. v. Air Line Pilots Ass'n Int'l*, 555 F.3d 399, 406 (5th Cir. 2009)]. In this case, despite potential deficiencies in the arbitrator's reasoning, the court cannot conclude that the arbitrator's interpretation was wholly divorced from the parties' CBA. While the court finds some of Southwest's arguments with respect to the CBA's date of effectiveness compelling, the mere fact that a court is convinced that the arbitrator committed serious error does not suffice to overturn an arbitrator's decision. *Id.* Therefore, after careful consideration, the court concludes that Arbitrator Jennings did not exceed his jurisdiction by ruling that TWU Local 555 filed its fourth grievance in a timely fashion.

On the issue of arbitrator bias, the district court concluded that the arbitrator's conduct did not meet the high bar to show fraud or bias under the RLA. Finally, the court remanded the case to a different arbitrator, to be selected under the terms of the CBA, for a hearing on the merits of the grievance.

Southwest timely appealed. In its opening brief, Southwest limited the scope of its appeal to the district court's affirmance of the arbitrator's ruling on timeliness.

## II. ANALYSIS

This is a dispute about a grievance that involves the application and interpretation of a CBA, so it is classified as a "minor dispute" under the RLA.[4] "Minor disputes must be resolved through compulsory and binding arbitration."[5]

---

[4] *Cont'l Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 555 F.3d 399, 405 (5th Cir. 2009).
[5] *Id.*

8

No. 18-10122

Judicial review of arbitration decisions "arising from the terms of a [CBA] is narrowly limited, and courts should afford great deference to arbitration awards."[6] This standard is "'among the narrowest known to the law' and flows from the RLA's 'preference for the settlement of disputes in accordance with contractually agreed-upon arbitration procedures.'"[7]

An award may be set aside:

> [1] for failure of the [arbitrator] to comply with the requirements of [the RLA], [2] for failure of the order to conform, or confine itself, to matters within the scope of the [arbitrator's] jurisdiction, or [3] for fraud or corruption by [the arbitrator] making the order.[8]

"Absent one of those exclusive grounds, or a judicially created exception for public policy concerns," we must defer to the arbitrator's decision.[9]

Southwest challenges the arbitrator's award under only the second statutory exception—that the award exceeded the scope of his jurisdiction, *viz.* the terms of the CBA.[10] An arbitrator exceeds his jurisdiction if he "issues a decision that is contrary to an unambiguous provision of the CBA . . . ."[11] "This is a narrow exception, however, and 'a court should not reject an award on the ground that the [arbitrator] misread the contract[.]'"[12] Rather, the decision "need only 'draw its essence from the contract[] and [not] simply reflect the [arbitrator's] own notions of industrial justice,' so that the decision is 'grounded in the [contract].'"[13]

---

[6] *Id.* (quoting *Resolution Performance Prods., LLC v. Paper Allied Indus. Chem. & Energy Workers Int'l Union, Local 4–1201*, 480 F.3d 760, 764 (5th Cir. 2007)).

[7] *Id.* (quoting *E. Air Lines, Inc. v. Transp. Workers Union, Local 533*, 580 F.2d 169, 172 (5th Cir. 1978); *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 323 (1972)).

[8] 45 U.S.C. § 153 First (q).

[9] *Cont'l Airlines*, 555 F.3d at 406.

[10] *Id.*

[11] *Id.*

[12] *Id.* (quoting *Cont'l Airlines, Inc. v. Int'l Bhd. of Teamsters*, 391 F.3d 613, 617 (5th Cir. 2004)).

[13] *Id.* (quoting *Cont'l Airlines*, 391 F.3d at 617).

If the arbitrator's decision "may be supported by *any* analysis" that "arguably construes" the CBA, whether or not relied on by the arbitrator, we must defer to that decision.[14] "Even if the chain of reasoning is not correct" and the "decision appears . . . to be a serious error," we "must defer as long as no step in the reasoning process ignores an unambiguous provision" of the CBA.[15]

Despite this deferential standard, Southwest maintains that the arbitrator ignored the CBA's terms about its effective date. Southwest cites several cases holding that arbitrators exceed the scope of their jurisdiction by ignoring or contradicting explicit terms in a CBA.[16] It also cites cases outside the RLA context vacating arbitration awards that contradict unambiguous CBA language.[17]

To support its contention that the arbitrator ignored the CBA's express terms, Southwest points to the CBA's cover language and to Article 29, which states that the CBA "shall remain in full force and effect as of the date of ratification through and including February 18, 2021." Southwest claims that, because the CBA does not expressly reference the "signing date," and the signature page states only "Execution Page," nothing in the CBA supports the

---

[14] *Id.* at 407.

[15] *Id.*

[16] *See BNSF Ry. Co. v. Bhd. of Maint. of Way Emps.*, 550 F.3d 418, 425 (5th Cir. 2008) ("We have previously held that an arbitration panel exceeds the scope of its jurisdiction if it ignores an explicit term in a CBA." (citing *Cont'l Airlines*, 391 F.3d at 620 (noting that an interpretation which reads out a phrase from an agreement cannot be an arguable construction of the agreement))); *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 406 (5th Cir. 2003) ("Although we are not unmindful of the high degree of deference the federal courts generally afford arbitrators, . . . an arbitrator may not ignore the plain language of a collective bargaining agreement.").

[17] *See Beaird Indus., Inc. v. Local 2297, Int'l Union*, 404 F.3d 942, 946 (5th Cir. 2005) ("It is well-established that courts may set aside awards when the arbitrator exceeds his contractual mandate by acting contrary to express contractual provisions."); *Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 604 (5th Cir. 1989) ("We agree with the company that the rule in this circuit, and the emerging trend among other courts of appeals, is that arbitral action contrary to express contractual provisions will not be respected.").

arbitrator's conclusion that the signing date should be treated as the effective date. Rather, insists Southwest, the signing of the agreement on March 16, 2016 was just a formality. Finally, Southwest contends that the parties' course of performance confirms its interpretation. It points to the CBA terms showing that Southwest started paying employees increased wages starting on March 1, 2016.

In response, Local 555 cites the deferential standard of review for labor-arbitration awards and contends that the arbitrator's interpretation of the CBA was arguable. Local 555's proposed interpretation is that Article 3's "when this Agreement is accepted by the Company" language imposed a condition precedent that was not satisfied until the CBA was both ratified by the union *and* signed by the parties. According to Local 555, Southwest did not "accept" the CBA until it signed the CBA on March 16, 2016.

Southwest's response to this specific argument is that it "had accepted the agreement *well before* the Union ratified it." Southwest maintains that its management and Local 555's leadership had agreed to the terms in the "tentative agreement" that Local 555 sent out to its membership for ratification. So, by the time the CBA was ratified, it had already been "accepted by the Company." In support, Southwest cites (1) a Fifth Circuit case explaining that the parties' conduct is determinative of the existence of a CBA;[18] (2) Third and Eleventh Circuit decisions holding that "Union ratification is generally considered to be 'the last act necessary . . . to create a

---

[18] *See Savant v. APM Terminals*, 776 F.3d 285, 290 (5th Cir. 2014) ("'An employer can in writing obligate itself to follow portions of a collective bargaining agreement without signing the collective bargaining agreement itself.' . . . Indeed, a CBA need not even be reduced to writing. 'Instead, what is required is conduct manifesting an intention to abide by the terms of an agreement.'" (citations omitted)); *see also Brown v. C. Volante Corp.*, 194 F.3d 351, 354–55 (2d Cir. 1999).

meeting of the minds and an enforceable agreement";[19] and (3) the general contract principles that (a) a contract can be accepted "in any manner and by any medium reasonable in the circumstances";[20] (b) contracts are generally interpreted as "a cohesive whole";[21] and (c) "[w]herever reasonable," contracts should be "interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade."[22]

We hold that the arbitration award conflicts with the plain language of the CBA. It was not an arguable construction of the CBA and instead amounted to the arbitrator's own brand of industrial justice. The arbitrator's interpretation failed to account for (1) the CBA's title page that sets February 19, 2016 through February 18, 2021 as the "period" for the CBA; (2) Article 29's express language that the CBA shall "remain in full force and effect as of the date of ratification through and including February 18, 2021"; (3) the CBA's one-time bonus paid to employees working under the CBA as "of the Date of Ratification"; and (4) the parties' conduct, including Southwest's payment of the increased rates and bonuses set out in the CBA, starting after the CBA was ratified but before it was signed.

The arbitrator ascribed significance to the CBA's "Execution Page."[23] But the Execution Page is not one of the CBA's terms, and none of the CBA's terms

---

[19] *Mack Trucks, Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 856 F.2d 579, 592 (3d Cir. 1988) (quoting *NLRB v. Deauville Hotel*, 751 F.2d 1562, 1569 n.10 (11th Cir. 1985)).

[20] RESTATEMENT (SECOND) OF CONTRACTS § 30(2).

[21] *Id.* § 202(2).

[22] *Id.* § 202(5).

[23] The relevant reasoning in the arbitration award is as follows:

By way of explanation, the ratification of a CBA is an internal procedure in which the Union membership reviews the negotiated items within the CBA. Once such ratification is completed, the Company is so advised and the Parties then agree that both Parties (the Company and the Union) will approve the agreement. The agreement is signed and dated by officials of both Parties. That signing date becomes the Execution Date and is presented on the Execution Page of the agreement. The Execution Date for the newly negotiated CBA is

mentions "execution," "signing," or "execution date." In contrast, Article 29 expressly provides that the CBA "shall remain in full force and effect as of the date of ratification . . . ." By relying on the Execution Page, the arbitrator ignored the express terms of the CBA. The arbitration award therefore was contrary to and not an interpretation of the CBA.[24]

We are aware that Article 3, titled "Status of the Agreement," ties the effective date to ratification *and* acceptance by Southwest, whereas Article 29, titled "Duration and Amendments," states only that the agreement "shall remain in full force and effect as of the date of ratification . . . ." But that does not justify the arbitrator's reasoning. Article 3 says only that Southwest must accept the agreement; it does not prescribe a specific mode of acceptance. The cases holding that a CBA need not be signed to create an enforceable agreement[25] and that ratification is generally the last act necessary to create an enforceable agreement[26] foreclose Local 555's argument that "accepted by the Company" in this instance meant the date the parties signed the CBA. Rather, the CBA's title page and language stating that it shall "remain in full

---

March 16, 2016 which is listed on page 89 of the present CBA. Grievance 5001/16 was submitted to the Company on March 28, 2016. That March 16, 2016 date is within the ten day required filing date for grievances.

[24] *See BNSF Ry.*, 550 F.3d at 425 ("By not making any finding as to the necessary element of causation, the [National Railroad Adjustment Board] essentially ignored a term of the CBA. Accordingly, sustaining the claims without any finding as to the second element of [a term in the CBA] was 'wholly baseless and without reason' and not an interpretation of the CBA." (citation omitted)).

[25] *E.g.*, *Savant*, 776 F.3d at 290.

[26] *See Mack Trucks, Inc.*, 856 F.2d at 592 ("Union ratification is generally considered to be 'the last act necessary . . . to create a meeting of the minds and an enforceable agreement.'" (citation omitted)); *NLRB v. S. Fla. Hotel & Motel Ass'n*, 751 F.2d 1571, 1581 n.14 (11th Cir. 1985) ("Article I of the collective bargaining agreement provided that the contract would become effective upon execution. . . . This clause notwithstanding, the Union and the Association created a valid and enforceable contract upon rank and file ratification . . . .").

## No. 18-10122

force and effect as of the date of ratification" confirm that it became effective on the date of ratification.

### III. CONCLUSION

We REVERSE the district court's judgment and REMAND for proceedings consistent with this opinion.